**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 25-1430**

KRISTIN SIMMONS,

Plaintiff – Appellant,

v.

UM CAPITAL REGION HEALTH, INC.; DIMENSIONS HEALTH CORPORATION, d/b/a UM Capital Region Health, Inc.,

Defendants – Appellees.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Matthew James Maddox, District Judge. (8:21-cv-02074-MJM)

Argued: December 11, 2025                              Decided: July 20, 2026

Before DIAZ, Chief Judge, and RUSHING and HEYTENS, Circuit Judges.

Affirmed by unpublished opinion. Judge Rushing wrote the opinion, in which Chief Judge Diaz and Judge Heytens joined.

**ARGUED:** Reuben W. Wolfson, SMITHEY LAW GROUP LLC, Annapolis, Maryland, for Appellant. Alison Nadine Davis, LITTLER MENDELSON, P.C., Washington, D.C., for Appellees. **ON BRIEF:** Joyce E. Smithey, Liesel J. Schopler, SMITHEY LAW GROUP LLC, Annapolis, Maryland, for Appellant. Morgan L. Kinney, LITTLER MENDELSON, P.C., Washington, D.C., for Appellees.

Unpublished opinions are not binding precedent in this circuit.

RUSHING, Circuit Judge:

Kristin Simmons sued her former employer, UM Capital Region Health, Inc. (UM Capital), and its related entity Dimensions Health Corporation, alleging that UM Capital terminated her employment for discriminatory reasons in violation of the Americans with Disabilities Act (ADA) and for retaliatory reasons in violation of the False Claims Act (FCA) and the Maryland False Health Claims Act (MFHCA).[1]  The district court granted summary judgment in favor of Defendants.  We affirm.

## I.

We review the district court's "grant of summary judgment de novo, applying the same legal standards as the district court." *Cowgill v. First Data Tech., Inc.*, 41 F.4th 370, 378 (4th Cir. 2022) (internal quotation marks omitted).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when, viewing all facts and reasonable inferences in the light most favorable to the non-moving party, a court finds that a reasonable jury could return a verdict in that party's favor.  *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012).

## A.

Simmons has fascia scapular humeral muscular dystrophy, a neuromuscular disorder that makes it difficult to control her facial muscles, and alleges that UM Capital

---

[1] Simmons also asserted other claims that are not on appeal.

3

terminated her employment for discriminatory reasons in violation of the ADA. UM Capital maintains that it terminated Simmons's employment "because of her rude and disrespectful behavior that on occasion amounted to insubordination and negatively impacted the overall collaborat[ive] environment and team building efforts" that her supervisor, Yeo-Jin Lee, and Lee's supervisor, Ingrid Connerney, "were making efforts to improve." J.A. 69.

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the . . . discharge of employees." 42 U.S.C. § 12112(a). "To establish a claim for disability discrimination under the ADA, a plaintiff must prove (1) that she has a disability, (2) that she is a qualified individual for the employment in question, and (3) that her employer discharged her (or took other adverse employment action) because of her disability." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015) (internal quotation marks and brackets omitted). The plaintiff must establish that her disability was a but-for cause of the adverse employment action. *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235–236 (4th Cir. 2016).

A plaintiff may prove disability discrimination through the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804 (1973); *Jacobs*, 780 F.3d at 572. Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.[2] *Wannamaker-Amos v. Purem*

---

[2] "To establish a prima faci[e] case of disability discrimination, a plaintiff must show (i) she was disabled, (ii) she was discharged, (iii) she was fulfilling her employer's legitimate expectations when she was discharged, and (iv) the circumstances of her

*Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025). "The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory justification for its allegedly discriminatory action." *Id.* "If the employer carries this burden, the plaintiff then must prove by a preponderance of the evidence that the neutral reasons offered by the employer 'were not its true reasons, but were pretext for discrimination.'" *Id.* (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

UM Capital proffered a legitimate, non-discriminatory reason for Simmons's termination, and we will assume, without deciding, that Simmons has made a prima facie case of discrimination. *See, e.g., Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Rowe v. Marley Co.*, 233 F.3d 825, 829 (4th Cir. 2000).

Simmons's ADA discrimination claim fails, however, at the third step of the *McDonnell Douglas* burden-shifting framework. At this step, a plaintiff must "show[] *both* that the [proffered] reason was false, *and* that discrimination was the real reason" for the adverse employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). "[U]nder the appropriate circumstances, 'a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'" *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

---

discharge raise a reasonable inference of unlawful discrimination." *Cowgill*, 41 F.4th at 379.

5

However, "if 'no rational factfinder could conclude that the employer's job action was discriminatory,' then the case should not proceed beyond summary judgment." *Sears Roebuck*, 243 F.3d at 854 (brackets omitted) (quoting *Reeves*, 530 U.S. at 148). For example, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148.

Simmons contends that she has met her burden of demonstrating pretext. Specifically, she claims that she has shown (1) evidence that UM Capital's reason for terminating her was false, (2) failure to follow UM Capital's disciplinary policy, (3) shifting and conflicting reasons for her termination, (4) lack of contemporaneous documentation, (5) circumstantial evidence of discrimination, and (6) evidence that she was treated differently than her similarly situated colleagues. We address each in turn.

1.

"A plaintiff may establish pretext through evidence that an employer's purported nondiscriminatory reason for her termination is false." *Wannamaker-Amos*, 126 F.4th at 257.

Simmons contends that her favorable annual review and the lack of any disciplinary action taken against her before her termination show that UM Capital's reason for terminating her employment—her rudeness, disrespect, and insubordination—is false. "[R]eviewing the record as a whole," neither fact supports a finding of falsity. *Dulaney*,

6

673 F.3d at 330.  We agree with the district court that "[e]ven though [Simmons's] singular performance review from . . . Lee is mostly positive, it cannot be read out of the larger context of [Simmons's] workplace conduct, which includes fraught communications and interactions between . . . Lee and [Simmons] that management viewed as disrespect and insubordination by [Simmons]." *Simmons v. UM Cap. Region, Health, Inc.*, No. MJM-21-2074, 2025 WL 488347, at *9 (D. Md. Feb. 13, 2025).  The fraught communications and interactions between Lee and Simmons are well documented in the record.  And the record makes clear that Lee perceived Simmons to be rude, disrespectful, and insubordinate throughout her employment.  Although no prior disciplinary action was taken against Simmons, Lee identified Simmons's "uncooperative and unprofessional attitude" as a reason for extending Simmons's initial probation period, J.A. 221, and Simmons was repeatedly advised that she needed to work on communicating with Lee, *see*, *e.g.*, J.A. 217, 221, 227, 229, 233.

Simmons also suggests that it is contradictory that Lee complained about Simmons's handling of an incident concerning Medmind, an infection control software system, when recommending Simmons's termination but had praised Simmons's implementation of Medmind in her annual evaluation.  However, Lee's statement, made in the context of recommending termination, that Simmons "[f]ail[ed] to communicate/escalate issues to [Lee] . . . in a timely manner," J.A. 327, does not contradict Lee's earlier statement in the annual review that Simmons "played a vital role during the Medmind surveillance program implementation," J.A. 300.  Notably, immediately following the latter statement, Lee stated that she "would encourage [Simmons] to continue

7

to develop skill sets in . . . communication." J.A. 300. Simmons also asserts that there was no record of this alleged Medmind incident. But the fact that not every single instance of Simmons's failure to communicate was contemporaneously documented does not show falsity.

### 2.

Evidence that an employer "failed to follow its own disciplinary policies in firing an employee can . . . be probative of pretext." *Wannamaker-Amos*, 126 F.4th at 260. "That is because an employer's extreme overreaction to a minor infraction may suggest that the relevant decisionmaker was looking for a reason to get rid of the plaintiff on discriminatory grounds." *Id.* (internal quotation marks and brackets omitted).

Simmons argues that UM Capital's failure to follow its progressive disciplinary policy is probative of pretext. We find that argument unavailing for several reasons. First, by its own terms, the progressive disciplinary policy is permissive, as are the steps within the process. J.A. 464 ("reserv[ing] the right to immediately terminate an employee in instances of serious misconduct where escalation is warranted"), 466 ("reserv[ing] the right to advance or omit steps of the process when warranted").

Second, Simmons has not shown that UM Capital "engaged in a disparate application of its progressive discipline" process. *Cowgill*, 41 F.4th at 383; *cf. Hamilton v. 1st Source Bank*, 895 F.2d 159, 162 (4th Cir. 1990) (finding that evidence a company fired its vice president for "[f]ailure to [p]erform" without following its progressive disciplinary procedures supported the jury's finding of a discriminatory discharge where

the company followed those procedures "when it rated another vice-president's performance as 'marginal'").

Third, Simmons's termination for rude, disrespectful, and insubordinate behavior cannot be characterized as an "extreme overreaction" to a "minor infraction." *Wannamaker-Amos*, 126 F.4th at 260 (internal quotation marks omitted). Her problematic behavior persisted throughout almost the entirety of her employment and, according to UM Capital, was "disruptive to the overall team environment and did not comport with [management]'s efforts to promote teamwork and collaboration." J.A. 70; *cf. Wannamaker-Amos*, 126 F.4th at 260–261 (finding that the employer's failure to follow its disciplinary policy when terminating plaintiff's employment was probative of pretext where there was "no documented evidence of any supervisor criticizing [her] performance prior to" a list created at the time of her termination and she was fired for allegedly failing to timely respond to a customer complaint); *Cowgill*, 41 F.4th at 383 (finding that the HR director's response to the request to terminate plaintiff "serve[d] as an additional layer of pretext evidence" where the director "appeared to question whether the disciplinary process escalated too quickly, asking whether '[plaintiff's] behavior . . . [was] out of character for her'"). Before her termination, Simmons was given ample opportunity to correct her behavior and specific suggestions about how to do so. *E.g.*, J.A. 217, 219, 227, 229, 287–290, 292–295, 297, 321–323, 325–329.

### 3.

An employer's shifting, conflicting reasons for terminating an employee can be probative of pretext. *Wannamaker-Amos*, 126 F.4th at 258 ("Although an employer may

9

have multiple legitimate reasons for firing an employee, its effort to retract certain reasons initially offered by the decisionmaker may suggest that none of those reasons were ever the true reasons and instead were pretext for discrimination."). A "constellation of justifications [that] is not internally inconsistent" may nevertheless be probative of pretext where "the purported justifications were not raised at the time of termination" and were not documented or otherwise corroborated. *Jacobs*, 780 F.3d at 576.

Here, the record indicates that UM Capital's explanation for terminating Simmons's employment—her rude, disrespectful, and insubordinate behavior—was raised and documented at the time of her termination and has remained consistent. In recommending that Simmons's employment be terminated, Connerney stated that Simmons's "issue and non-agreement with [Lee's] leadership is impacting functioning of the whole infection team and [Simmons] is withholding timely communication with [Lee]." J.A. 322. In agreeing that Simmons's employment should be terminated, Lee stated that "[d]espite the effort by HR and management during the past year, [Simmons's] disrespectful and unprofessional behavior towards [Lee] continued and there is no sign of sustained improvements in her behavior." J.A. 329. In its position statement to the Equal Employment Opportunity Commission, UM Capital stated that Simmons was terminated "for her consistent inability to work collaboratively with her boss." J.A. 590. Specifically, "Simmons did not like or respect her boss, . . . Lee, and was not particularly nice about it. She could not work collaboratively with . . . Lee; she felt that she knew more than her and regularly tried to prove it. . . . Simmons was warned repeatedly about the need to engage with . . . Lee and work collaboratively, but simply would not do so." J.A. 589.

10

4.

Similarly, "[d]ocumentation created at [or near] the time of termination which relies on past events for which there is no contemporaneous documentation may be evidence of pretext." *Wannamaker-Amos*, 126 F.4th at 258 n.7; *see also Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 218–219 (4th Cir. 2016) (finding that "[t]he absence of any evidence to support [the employer's] lack-of-work explanation" was "important" and the fact that emails that "explicitly sa[id] there was not enough work for [plaintiff]" "came on the heels of the protected activity . . . suggest[ed] that the reason given in the emails was a pretextual one"); *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502–503 (4th Cir. 2001) (holding that the "jury could have concluded that the last-minute documentation of [plaintiff's] job performance supports the inference that [the employer] contrived [plaintiff's] alleged performance deficiencies, *after* learning of her request for sick leave, in order to create the appearance of a non-discriminatory reason for [plaintiff's] termination" where "the record establish[ed] that no written complaints about [plaintiff] were documented in her personnel file until the day before she was fired, despite [the employer's] policy that complaints about employees should be recorded contemporaneously").

Here, there is no shortage of contemporaneous documentation of Simmons's rudeness, disrespect, and insubordination towards Lee. *E.g.*, J.A. 219, 221, 227, 229–231, 233, 302–304, 309–311, 314, 317–319, 440.

11

5.

Simmons contends that Lee's and Connerney's comments about her face are circumstantial evidence of discrimination. However, the record indicates that when they commented on Simmons's "blank face," they were not aware that her appearance was due to a disability. *Cf. Est. of Hoffman v. Balt. City Pub. Schs.*, 173 F.3d 424 (Table), 1999 WL 61965, at *1 (4th Cir. 1999) ("An employer must be aware of an individual's disability for ADA liability to exist."). And to the extent that Simmons claims that either supervisor continued to comment on her face after she disclosed her disability to them on March 2, 2018, Simmons's claim is not supported by the record. Accordingly, their comments that Simmons's face showed disengagement do not evidence discrimination.

6.

"[E]vidence that other employees who were similarly situated to the plaintiff (but for the protected characteristic) were treated more favorably" is "especially relevant to a showing of pretext." *Cowgill*, 41 F.4th at 381 (internal quotation marks omitted).

On this front, Simmons alleges that Lee carried a notebook with Simmons's name on the cover while not doing so for other employees, that Lee discontinued one-on-one meetings with Simmons, and that a coworker believed Lee criticized ideas coming from Simmons but would not do the same if the idea was proposed by others.

Simmons's comparator evidence does not support a finding of pretext. First, even assuming that Lee carried a notebook with Simmons's name on it while not doing the same for other employees, that fact does not suggest that Simmons was treated differently than a similarly situated coworker—i.e., a coworker who committed similar misconduct. It thus

does not show pretext. *Cf. Cowgill*, 41 F.4th at 382–383 (finding evidence of pretext where plaintiff was terminated purportedly for mere call avoidance while two similarly situated employees were disciplined only after engaging in call avoidance "*and* committing attendance infractions").

Second, Simmons contends that Lee discontinued one-one-one meetings with her and that the "reasonable inference" to draw from this fact is that Simmons did not have any performance issues or that UM Capital was not making sincere efforts to coach or help Simmons. Neither inference is reasonable in view of the record as a whole. Simmons's performance issues are well documented. *E.g.*, J.A. 219, 227, 233, 317–319, 440, 302–304, 309–311. And according to Simmons herself, Lee conducted one-on-one meetings with her for at least one year of her 17-month employment. The evidence shows that Simmons was repeatedly instructed that she was expected to communicate with Lee with respect and given specific examples of how to do so. *E.g.*, J.A. 219, 221, 227, 233, 297. Despite all that, Simmons's behavior remained unchanged. Last but not least, Simmons made it abundantly clear that she did not want to have one-on-one meetings with Lee. *E.g.*, J.A. 229–230, 297, 318, 497. Thus, even assuming that Lee discontinued one-on-one meetings with Simmons, that fact does not evince pretext.

Third, the perception that Lee tended to dislike ideas coming from Simmons, even if true, does not raise an inference of pretext. For example, Lee could have disliked ideas coming from any employee who was rude, disrespectful, and insubordinate; Simmons identifies no evidence to the contrary.

13

* * *

Because Simmons has not shown a genuine dispute about whether UM Capital's stated reason for her termination was a pretext for disability discrimination, we affirm summary judgment for Defendants on her ADA discrimination claim.

B.

We turn now to Simmons's allegation that UM Capital retaliated against her by terminating her employment after she engaged in activities protected by the FCA and the MFHCA.

The FCA prohibits any person from knowingly presenting a false or fraudulent claim for payment to the federal government or making a false record material to such a claim. 31 U.S.C. § 3729(a)(1); *see United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 196 (4th Cir. 2018). It also contains a provision that protects whistleblowers from retaliatory adverse employment actions. 31 U.S.C. § 3730(h). To succeed on an FCA retaliation claim, the plaintiff must prove that "(1) he engaged in protected activity; (2) his employer knew about the protected activity; and (3) his employer took adverse action against him as a result."[3] *United Airlines*, 912 F.3d at 200.

"Protected activity" includes acts done "in furtherance of an [FCA] action" and "other efforts to stop 1 or more [FCA] violations." 31 U.S.C. § 3730(h)(1); *see also United Airlines*, 912 F.3d at 200. To qualify as an effort to stop an FCA violation, the plaintiff's

---

[3] Like the FCA, the MFHCA prohibits "false or fraudulent claim[s] for payment or approval" through Maryland health plans and programs, Md. Code., Health-Gen., § 2-602(a)(1), and has an anti-retaliation provision, *id.* § 2-607(a). The parties address the FCA and MFHCA retaliation claims jointly without distinction, so we do the same.

14

act must have been "motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA." *United Airlines*, 912 F.3d at 201. "A belief is objectively reasonable when the plaintiff [proffers] facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the FCA." *Id.* at 201–202. Although "the plaintiff's actions need not lead to a viable FCA action[,] . . . they must still have a nexus to an FCA violation." *Id.* at 202 (internal quotation marks omitted).

We agree with the district court that Simmons failed to create a genuine dispute about whether she "engaged in efforts to stop potential FCA violations based on an objectively reasonable belief that her employer was violating, or would soon violate, the FCA." *Simmons*, 2025 WL 488347, at *11.

Towards the end of 2018, UM Capital began looking for ways to obtain additional beds for patients in its intensive care unit (ICU). One option was to designate four post-anesthesia care unit (PACU) beds as ICU beds. At that time, those PACU beds were being used as overflow beds, including for ICU patients. UM Capital is required to collect and report infection data for ICU beds to the National Healthcare Safety Network (NHSN). The infection data is used to determine UM Capital's Medicare reimbursement rates. There is no requirement to collect and report the infection data of PACU beds. To redesignate the PACU beds as ICU beds, and to start tracking and reporting infection data for those beds, the PACU beds would have to meet the NHSN's "80 percent rule," which requires that the beds be occupied by ICU patients 80 percent of the time. To determine whether

15

the beds met the 80 percent rule, the infection prevention team needed to collect data for some months to ascertain what types of patients were using the beds.

Simmons asserts that she suspected UM Capital planned to commit fraud against the government by combining the PACU and ICU numbers to "pad[] the denominator" used to calculate infection data submitted to NHSN and thereby receive higher reimbursement rates. Opening Br. 46. Viewed in the light most favorable to Simmons, the evidence does not support a finding that her belief that UM Capital would soon commit fraud was objectively reasonable. The evidence establishes that Simmons was instructed to collect data and tally the numbers separately. Specifically, Lee's instructions were "to count [PACU and ICU] device/patient days" and for "PACU to tally their numbers *separately* from ICU to validate [the] process." J.A. 307 (emphasis added). Whether the PACU beds met the 80 percent rule was a preliminary question that had to be answered before determining whether those beds could be redesignated as ICU beds. And whether the PACU beds could be redesignated determined whether infection data for those beds had to be tracked and reported to NHSN. Thus, we agree with the district court that "any belief that [someone] at UM Capital . . . would soon report false data would not be objectively reasonable because the data she contends would be falsely reported had not even been collected." *Simmons*, 2025 WL 488347, at *11.

Further, Simmons has not shown that it was objectively reasonable for her to believe that, after she collected the data Lee requested, Lee then planned to combine the infection data for PACU and ICU beds and report it to NHSN without confirming whether doing so was appropriate. Even accepting Simmons's testimony that Lee initially expressed a desire

16

to combine the two units, the evidence does not support the conclusion that Lee would do so if pertinent regulations forbade it. *See* J.A. 309 (Lee responding to Simmons that "[b]ecause of th[e] uncertainty of the bed utilization, we need to start collect[ing] data to determine further about this" and that Lee "will talk[] to [others] and let [Simmons] know what [the] next step will be").

Simmons claims that she attempted to stop the fraud "by refusing to engage in the criminal activity, . . . confirming with NHSN as to the legality of the proposed actions as part of her investigation, and . . . immediately and repeatedly objecting to the perceived fraudulent conduct." Opening Br. 46. The evidence does not support a finding that Simmons engaged in any effort to stop any potential FCA violation. She was instructed to, and refused to, collect data. Collecting the data is not an illegal activity; falsely reporting it is. We also agree with the district court that "the record is clear that [Simmons's] inquiry to NHSN by email . . . was not an effort to stop any potential FCA violation." *Simmons*, 2025 WL 488347, at *11. She "was not alerting NHSN of any false reporting by her employer. She merely posed a question of how data may be reported in compliance with NHSN rules." *Id.* And notably, Simmons did not disclose NHSN's response to Lee until almost two weeks after she received it. Forwarding the response from NHSN to her coworkers—but not to Lee or any supervisor— as an "insurance plan," J.A. 314, can hardly be construed as an effort to stop the alleged FCA violation.

Because Simmons has not shown a genuine dispute about whether she engaged in an effort to stop potential FCA or MFHCA violations based on an objectively reasonable

17

belief that her employer was violating or would soon violate the FCA or the MFHCA, we affirm summary judgment for Defendants on Simmons's retaliation claims.

## II.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.